numbers 11-2573 and 11-2978. Mr. Antonelli and Ms. Vazquez. Come on up. Good morning. Please the court. My name is Richard Antonelli and I'm here on behalf of Grane Healthcare Company and Ebernsburg Care Center. And you wish to reserve how much time for rebuttal? Four minutes, Your Honor. That's fine. The first question here is, what makes you think WINR changes the state of play with regard to the type of test you used here? I mean, I read this and I was I said to somebody, I said, Judge Becker, who was, I think, wrote Pascarell, I think he must be turning in his grave. What makes you think WINR changes things? Well, a couple of reasons, Your Honor. First of all, WINR's language is very broad and it speaks in terms of any plaintiff who seeks injunctive. But doesn't doesn't our precedent don't our precedent say in order for us to depart from our own precedent, it's got to be very clear. And is there is this clear? I believe it is, Your Honor. I mean, the Supreme Court could not have spoken in clear language. And as a matter of fact, but you've got you've got a five circuits going one way. You've got four circuits going the other way, saying that your way. And you've got the first and the second circuit doing some sort of hybrid. Yes, sir. Now, you would think if the Supreme Court was going to resolve that in WINR, they would have said, you know, we got this on this side. We got this on that side and we got these two circuits sort of trying to straddle the middle. And here's what we're going to do. Didn't do that. I guess, Your Honor, I view it the other way. I mean, the Supreme Court has to be well aware of the precedent out there. But if they're well aware, they're also ain't no doubt about it, they're pros. And if they're going to if they're going to overrule something, they're going to say, there's this issue, there's this split. And here's what here's what we are going to do. Well, WINR was a case not unlike a 10-J issue. It just involved a different statute. But the standard that the government or that the petitioners offered was very much the same as the standard that this court applies in 10-J situations. And that standard is there is almost a presumption of injunctive relief absent extraordinary circumstances. That's not what WINR said. What WINR emphasized was any time a plaintiff seeks injunctive relief, the first thing that plaintiff must prove is irreparable harm, as well as the other three factors in that test. And they made no exception. They didn't say we recognize that in some cases, you know, we have a lesser standard. They said any plaintiff, any time. They didn't qualify it at all. And they did it again in Monsanto versus Gertsen on June 21st, 2010. Same statute, same issue, reemphasized. We don't accept people from proving the four factors. Wait a minute. You say same statute, same issue. You don't mean? I don't mean 10-J. 10-J. You mean? NEPA or whatever. I'm sorry? I think it was NEPA. Yeah. I mean, that was the issue with respect to Sonar, I think, was the one in Winter, was it not? Isn't the point that 10-J makes all the difference, though, in this particular circumstance? Because the court ultimately, the district court doesn't have jurisdiction over whether there was an unfair labor practice. And he didn't exercise that jurisdiction. What he did was he reviewed the evidence in light of his responsibilities to determine whether the four factors were present. He didn't decide whether there were unfair labor practices committed or were not committed. What he decided was, was that in one instance, in the instatement issue, the evidence wasn't sufficient to demonstrate irreparable harm. And he was correct in that regard. In the other instance, he decided that there was irreparable harm. And the flaw, I believe, in Judge Gibson's opinion is that he didn't recite any facts. So even Judge Ambrose, if Winter doesn't apply, surely Judge Gibson had to recite some facts to support the board's contention that irreparable harm would result if a bargaining order isn't issued. They didn't do that. There is no fact, there are no facts in the record to demonstrate how the collective bargaining processes, which is what 10-J is concerned with, would have been harmed. Do we have jurisprudence that says, in certain circumstances, I don't have a case that I can recite, but that if there's a statutory case, a statutory violation, irreparable harm is presumed? I've heard of such cases, Your Honor. I didn't see any in my research. Okay. That was the argument. I can't give you one right now. I'm sorry? I can't give you one either right now. That was the argument by the petitioners in the cases involving NEPA. And that's where, if I may, I think it was Justice Alito, responded to that question like this. Whether to grant injunctive relief, the proposition you propose, Your Honor, inverts the proper mode of analysis. An injunction should issue only if the traditional four-factor test is met. That was Judge Alito and the Court's response to a similar contention by the petitioners. So I don't think our position reads Winter too broadly. I think Winter is written on purpose to be broad. Winter deals with the general standard, does it not? It does. And so, I mean, getting away from what test you use, I mean, isn't your main argument that with regard to a public entity, we are not a successor? That's correct, Your Honor. That is one of our principal arguments. And I could only find a couple of cases on this. There's a Seventh Circuit case, and it appears to go the other way. What's the argument that you make for why public entity that was previously there is different? The Seventh Circuit case you refer to, the name of which escapes me now. I'll have it right here. I can tell you from the panel, but I can't. There's Flom and Easterbrook on the panel. Yes, sir. At oral argument, counsel for the – Lincoln Park. Yes, sir. Lincoln Park Zoological Society. Correct. Counsel for the employer raised at oral argument for the first time that finding successorship was inappropriate because the previous employees had been employed by a public employer. And what the court said is that is, quote, an apt point, but you waived it. And so they recognized the legitimacy of the argument but didn't address it because it had been waived. What about the Dean Transportation case of the D.C. Circuit?  Cites to the – on the public-to-private successorship issue, the court commented that the ALJ correctly noted that the board applies the traditional successorship test, even where the predecessor is a public employer. No analysis. We've provided that analysis. Under the National Labor Relations Act, a public employer not only isn't covered, they're expressly excluded by the very language of the statute, as are the employees who they represent. So it's difficult for me to appreciate the distinction that Judge – Administrative Law Judge Goldman drew in the initial unfair labor practice trial. He asked a very important question. The SEIU also wanted successorship. And his question to them was, successor to what? The SEIU under state law wasn't even a collective bargaining representative. It was a meet-and-confer unit. I asked the same question about the laborers. The laborers have never – in this case, Local 1305 has never represented anyone but public employees. It's not like it's an amalgamated union that has representation of other private folks. It is only a public – a union who represents public employees. And in that regard, its coverage, it's specifically excluded from the act. So here we have a certification by a state agency back in the mid-1980s. No one knows whether there were irregularities in that certification. No one knows anything about what happened back in the 1980s. No, but they had been there for a long time. Long time. And Mount Laurel pretty much continued on, albeit with new ownership, did it not? Your Honor, the factors for successorship otherwise are present. We don't dispute that. And if they were a private employer, we wouldn't be standing here today. Was the union properly certified under state law? There was a certification, Your Honor. It's difficult to question the certification. We don't know whether there were objections, challenges. It's simply too long ago under state law. But I will tell the court that the state – Pennsylvania state law procedure is, to some extent, analogous to the procedure under the National Labor Relations Act. However, there's a recent case that the board just decided that actually changed the landscape of certification. And as Your Honors probably know, we stipulated that the unit would be proper for purposes of collective bargaining under all circumstances except the public nature of the employer and the employees. Given the board's recent decision, I wouldn't enter into that stipulation today because the landscape has changed. And so we may even have a situation where the certification of the laborers isn't appropriate for bargaining as the board now, very recently, just a couple of months ago, interprets how to certify employees for purposes of bargaining. So we are faced with having a bargaining obligation. We're succeeding to a bargaining obligation that no one had before. The first time the National Labor Relations Act attaches to my client is on January 1, 2010, the day that the asset purchase was closed. Just for the – we'll give you a little more time. If you would address the in-statement issue with respect to Hagerich and Mulhern. Yes, sir. Judge Gibson correctly found, and the record is replete – well, the record is sort of loud with the absence of evidence on how their in-statement. Grain knew of Hagerich's and Mulhern's union leadership roles. Eighty percent of non-leadership was retained. Twenty percent of leadership of the union was not retained. Lengel's testimony regarding the rejection of Hagerich and Mulhern relied on Nellen, and Nellen said, I never said those things. That's not what – I'm sorry. You're finished. That's not what Nellen said, and that's not what Judge Gibson said. I don't recall any of that – those conversations. I have the benefit of the advantage of having cross-examined Ms. Neelan. And Ms. Neelan initially testified that she never said those things, and then on cross-examination she acknowledged, well, you know, we probably had a few conversations, but I can't recall the particulars. But she didn't recall the particulars as they were stated by Lengel. Well, she did recall the particulars saying that the employees on the first floor, which included Hagerich and Mr. Billy, did not include Mr. Mulhern, she admitted saying something like, you've got to blow the first floor up, they're difficult people, and she acknowledged that on cross-examination. Except that the performance reviews with respect to Hagerich and Mulhern were pretty good, were they not? Actually, they weren't. And as a matter of fact, Ms. Lengel was asked by counsel for the general counsel whether she reviewed those personnel files. Ms. Lengel said no. When asked why, weren't they available to you, she said no. And, in fact, they were not. They were the property of the seller, who wouldn't turn over those personnel files to the buyer. And so that's why she had a – I thought the performance reviews suggested that they were solid employees. The performance reviews were consistent with Neelan's criticisms of them. Ms. Hagerich was abrupt and loud and difficult. Mr. Billy, I can't remember the description of Mr. Billy, but it was disrespectful, I believe. Mr. Mulhern was a fellow who wouldn't work overtime. And in this health care setting, you know, one doesn't employ people who are unwilling to stay on a shift if somebody else doesn't show up. And so Judge Gibson did a very careful review of the record and said and found Ms. Lengel's testimony is consistent with what Ms. Neelan now admits to recalling. If we decide that the test is the two-prong test rather than the four-prong test of winner, should we not remand this for the court to consider this in-statement issue under the two-prong test? I don't think so, and here's why. Even the Board has acknowledged that even under the jurisprudence it cites, that the hallmark of determining whether an order ought to issue is the ultimate remedial failure of the Board's remedy. That sounds very much like irreparable harm. And so one can read some of the later Third Circuit decisions to, even if they don't come out and say it, to imply that irreparable harm must be found. Judge Gibson went through that analysis and found none. As a matter of fact, his findings are a little bit internally inconsistent because he finds no anti-union animus in respect to hiring decisions, but then he finds without any factual support that a bargaining order ought to issue because the collective bargaining process. So are you suggesting we should assume that he would find, you know, one way or the other using the two-prong test? I mean, Judge Ambrose's question was if we don't agree with the test he applied, should we send it back for the test that he should have applied? Well, you know, that's certainly an option, but I think you have a complete record in front of you, and I think, you know, if a decision is supported by the record, you all have the authority and the power to revise it. Based on what I said? To include in statement? You know, if we looked at the record and we said, we looked at the record differently than Judge Gibson and found that you essentially cut off the head of the union. I guess I'm between a rock and a hard place. You know, that wouldn't be my preference, but, you know, you can't have it both ways, I guess. One more question. What about the ALJ's findings? Should the district court, is there any type of deference owed by the district court? There can be deference owed. The district court can pay some respect to the ALJ's findings, but the first thing he has to do is he has to be persuaded that those findings are reasonable, and that's why Judge Gibson parsed the record the way he did. On credibility, it's kind of tough to say that I'm going to overrule you. Actually, Your Honor, even the board reserves the right and says that ALJ's credibility determinations do not bind the board. Correct. They don't bind the board, but, boy, it's got to be pretty clear error for you. Well, actually, the only time they'll defer to an ALJ, and it's not mandatory deference, is when he is strictly reading demeanor. Otherwise, conclusions drawn, inferences drawn from testimony, the board simply refuses to defer to an ALJ. We have it in the immigration context. That comes up all the time. Why don't we hear from Ms. Vasquez, and we'll get you back on rebuttal. Thank you. May it please the Court. I'm Laura Vasquez for the NLRB. The issue here is whether the district court abused its discretion in granting interim bargaining order but denying the interim hiring. The court was ---- The first issue, if you could just address to the judge's view, the district judge's view, that somehow the Supreme Court opinion of Winter has overruled what previously existed with respect to the test to be used in this context. Winter did not change the existing test. It didn't alter Weinberger v. Romero, and the focus of Weinberger and Winter is the holding is that certain statutes that authorize injunctive relief do not deprive the district court from exercising its equitable discretion. So what Weinberger said is the focus of injunction is always irreparable injury and remedial failure, and the two-part test that's applied under 10J by this Court and the others that apply it is perfectly consistent with that. It does take into account irreparable harm and remedial failure, as the language in cases from Pascarell, suburban lines, et cetera, and cases in the other circuits that apply the two-part test acknowledge that under the just and proper prong of the two-part test, you consider the equitable factors, you take into account the harm, the relative harms, the public interest behind 10J, which is protecting the collective bargaining process. So that's why the Sixth Circuit has specifically rejected the argument that Weinberger requires a different standard. That's why the Fifth Circuit more recently in a case after Winter retained the two-part test. It's highly clear that Weinberger and Winter mandate a different test. Go ahead, Mike. Well, back to the question Judge Ambrose asked, if we think that the two-part test should apply and not the four-part test that Judge Gibson shows, is a remand appropriate? I don't think so, Your Honor. The record is complete. The evidence is there as to reasonable cause. The evidence was presented, the complete ALJ record, the ALJ's decision, the just and proper hearing before the district court included the evidence relevant to the just and proper factors. So there is no need to remand. Actually, the court's errors here with respect to the hiring order are erroneous under either standard. So I don't think it's necessary to remand. The court's analysis of the evidence and making its own credibility assessments and rejecting without explanation the ALJ's contrary credibility determinations, that's wrong. So what you're saying is the court applied the wrong standard, but even if it applied the right standard, it would have ended up in the same spot. Right, because even under the reasonable, whether under reasonable cause or likelihood of success, what the court did was wrong. It didn't give appropriate deference to the ALJ. It looked at the evidence as if it were the fact finder. It made credibility assessments instead of looking at whether there is sufficient evidence to support a substantial legal theory, which is how it's phrased under reasonable cause, or whether there is sufficient evidence to support an arguable legal theory, which is the similar phrasing under likelihood. In the instatement part of the case, in which you would claim that the judge applied the wrong standard, what do you want to do there? You want to remand there, don't you? I think there's enough evidence in the record for this court to reverse. Mr. Antonelli has pointed out that there's a lot of evidence going the other way. Shouldn't we send it back and at least allow both sides to make the arguments under the two-prong standard, if that's what we decide is the one we should be applying? The arguments were made. The evidence, the record for the reasonable cause analysis is complete. The ALJ transcript is complete. The ALJ decision has come out. There's no new evidence that can be considered by the court to decide the reasonable cause, because it cannot be based on anything different than what was put before the ALJ and that is being put before the board. Because the board below was arguing for the two-part test, the test was argued and the case was argued keeping in mind that what test was applicable was one of the questions. So I would say that it's been argued and the record is complete and there's no need for remand. Let's go back to the test for a moment. The Weinberger v. Romero case that you mentioned says that courts should not lightly assume that Congress has intended to depart from the general four-part test. And when you look at J, it says the board shall have power upon issuance of a complaint charging any person who has engaged or is engaging in an unfair labor practice to petition for appropriate temporary relief or restraining order. The court shall have jurisdiction to grant to the board such temporary relief  That's a general statement of, or a general grant of authority. That's correct. So it's a gloss of the board and the courts as to this two-prong test. Have we really given all of the deference to, or has Congress really made a statement that you can veer away from the four-part test here? It doesn't look like it. Well, the key difference and what led courts to adopt the reasonable cost, just and proper test is that the Act, although 10J doesn't relate to that part of the statutory scheme, the Act in general, it's clear that district courts have no jurisdiction to decide the merits. And so the courts are in a different and unique posture in looking at preliminary injunctions under 10J. And that is why this court and the Fifth Circuit in the Boyer v. Teamsters case that suburban lines relies on, that's why the courts opted to use that reasonable cost, just and proper test. But it's not inconsistent with Weinberger or Winter because the primary concerns under the equitable test of Weinberger and Winter are the irreparable harm, the balance of harms, the public interest, and all that is incorporated under the just and proper language. Put another way, what gives courts the authority here to assume that Congress meant something other than the usual four-part test? I think it's, again, the statutory scheme under which the courts will never resolve, the district courts will never resolve the merits of the violations. And they have to show a certain deference to the board's expertise in terms of adjudicating unfair labor practices. Incidentally, what's the timeline now? Now the ALJ has decided it's before the board, right? Is there an expected time that the final opinion is going to be? I cannot predict when the board might decide. Under the board's regulations, when a 10J petition is filed in a case, under the regulations, the board has to expedite it. They get flagged into a different category for faster treatment. I do not know when the briefing before the board was completed. I'm presuming that the ALJ decision, which came out in December 2010, I'm assuming there were maybe a month or two of briefing after that. Well, in a non-binding kind of way, are you talking about generally, and again, it's not binding, are you talking about a matter of years or a matter of months? No. Hopefully, we believe it's a matter of months, yes. Okay. In terms of the bargaining order, Green, the company, relies on this public-to-private transition. And I did want to point out that it's not just the Lincoln Park Zoo and the dean transportation cases. There's other cases, some of them enforced by the D.C. Circuit, where this precise question has been considered and answered. And the board has said, page 39 of the board's brief, vanlier equipment, successorship applies even though the predecessor is a public employer, seems technologies, public-to-private change doesn't prevent the legal successorship. Are you aware of cases that go the other way, even board cases? I don't know of any, no. It's a uniform, it's been a uniform solid line of cases, therefore either under reasonable cause or likelihood of success. The company's position is basically contrary to clear precedence. So they fail under either test. This notion that the district court did not recite the irreparable harm, the court found irreparable harm to the collective bargaining process and found no countervailing harm to the company from a bargaining order. It, the record, the evidence is in the record. I don't, it's unnecessary to either, there's no grounds for reversal or unnecessary to remand on that basis where there's evidence, number one, that a successor refusal to bargain with an incumbent union, sort of as a fact, creates at least one of the irreparable harms, which is depriving employees of their choice of a union and depriving them of their bargaining rights and their representation. That's a harm that's been recognized by the courts in successor cases. And it's something that happens naturally from the refusal to bargain. But in addition to that, there's evidence in the record of employees expressing fear, feelings that they were being watched, concerns about the future of the union, the public activity stopped completely, there were no more meetings. It's exactly the type of evidence that courts have repeatedly relied on in 10J cases to find irreparable harm. Could you go, just the limited time you have left, to talk about the instatement of Hagerich and Mulhern issue? Yes. I mean, the thought here is, and I think Mr. Antonelli touched on it, in the context of a 10J injunction, the district court is not necessarily reviewing the ALJ's holding. Now, the ALJ makes credibility determinations, but isn't the district court able to make its own credibility determinations here? Not under the 10J case law. The case law is very clear in this circuit and others that the court should refrain from making credibility determinations and that the court should owe some deference, given the fact that what the court needs to determine is whether the board is likely to uphold or reject the ALJ's findings. That's the prism through which it has to be looked at. And when the ALJ has made findings based on demeanor, based on the disinterest of a particular witness, like he did in this case, he made very careful and detailed analysis of the demeanor and the respective positions of the witnesses. And that is something that under this court's standard, this court's standard is that an ALJ's credibility findings are not rejected unless they're inherently incredible or patently unreasonable. That's, I believe, the Atlantic Limousine case. But there's more. There's others. And so it was wrong for the court. It doesn't mean that it's a rubber stamp and the court had to accept them, but the court had to provide some explanation, valid reason for why these careful and detailed ALJ findings are likely to be rejected by the board or by this court on review. And the court did not do that at all. It simply looked at the evidence anew, ignored completely, did not even acknowledge the ALJ's contrary findings, and made its own contrary determinations. And that is clearly wrong under the 10-J standard and under the deferential standard that this court and the board use on review of the actual decision. Roberts. Thank you very much. Thank you. Here for Mr. Antonelli. Thank you, Your Honor. It is indeed a rubber stamp, Your Honor. And in respect to whether Judge Gibson explained himself, I refer the court to the joint appendix at pages 35 through 44, 45. He went through a very detailed explanation. I would be remiss. But this is on the end statement, do you mean? Yes, sir. But isn't Ms. Vasquez correct, and I think I'm conflating the two things that she said, but essentially that it has to be patently incredible as to the ALJ's You're just not there. Well, I don't know where that authority comes from. It comes from us. The district court is charged with a responsibility to make those determinations, and I respectfully refer the court to a decision of the Eighth Circuit that, frankly, I missed back in 1999. Ms. Vasquez put correctly our decision in the Atlantic Limousine case. ALJ's credibility findings are not reversed unless inherently incredible or patently unreasonable. Well, Your Honor, if that's the standard in this court, then I think it's incorrect because that usurps from the district court his Article III responsibilities. He's not being asked to decide. We're not free to ignore what we've said before, though. That's the problem that you face. You're free to ignore it in the sense that those interpretations, I believe, grew up in the context of the very liberal standard of Section 10J, and that's just not what we have here. So that if that liberal standard applied, it would be difficult for me to say to Your Honor, no, you can't follow that. Well, if we were to conclude, for example, that you've made a heck of a good argument, but we're bound by the existing precedent and winter is not so clear to us that it allows us to depart or abandon our prior precedent. It has to go on. Any determination like that would have to be en banc. Then you're stuck also with Atlantic Limousine. Your Honor, I would be so stuck, except I think Atlantic Limousine is faulty for the reasons that, you know, I've been up here talking about. What's the citation for the Eighth Circuit case? Oh, yes, sir. 172, Fed Third, 1034. It goes to the proposition, like the Board argues here, that Judge Gibson was really outside of his jurisdiction in deciding the merits of the case. And the Court in the Sharpe case said the purpose of the inquiry in deciding whether to issue 10J isn't into the merits or to second-guess the Board's decision. Rather, the likelihood of success is relevant to the issuance of a preliminary injunction because the need for the Court to act is at least in part a function of the validity of the applicant's claim. The Board was an applicant claiming a right to injunctive relief. Judge Gibson would have been, I think he would have been mistaken had he simply adopted the ALJ's findings. Even the Board doesn't adopt the ALJ's findings. They expressly say so. Their rules actually say we make the credibility determinations unless it's strictly a question of demeanor. One other point, Your Honor, and that's this. There's a case by the Board, Atlantic Technical Services Court, 202 NLRB 169, and it's a 1973 case. We put it in our brief, but based on what Ms. Vasquez said, I think it bears some comment. And this goes to the successorship issue. As Your Honors know, our position is that the successorship holding started with two ALJ decisions by the same administrative law judge that have become essentially a rumor chain. There was no analysis, no citation to authority. Atlantic Technical Services actually denies successorship for a variety of reasons in the context of a switch from the Railway Labor Act employer to a National Labor Relations Act employer. And it cites as one of the factors denying successorship the fact that the prior employer and the prior employees were covered by the Railway Labor Act and not the National Labor Relations Act. That's in our brief, but given Ms. Vasquez's position, I think it bears some comment. I think it was you, Judge Ambrose, but I'm not sure. I asked about the timeline. One of the arguments we made here is that the Board always, you know, their song, so to speak, is, their hymn is, you have to preserve labor peace. Injunctions have to be issued to preserve labor peace. This deal got done on January 1st, 2010. This dispute before the ALJ and the district court and before this court is still ongoing. Had the employees done what we suggested is necessary, that is, petition for an election under the National Labor Relations Board, that process takes, according to the Board's figures, 19 days. So it's very likely that by the end of January the issue would have been decided and we would have labor peace. But if you're in that position, if you think you're already in, why would you ask for an election? I'm sorry? If you think you're already entitled to be the representative of the employees, why would you ask for an election? They didn't, well, they had reason to think that we weren't going to recognize them because I wrote them a letter. When they asked for recognition in anticipation of the deal, I wrote them a letter and said, we're not going to recognize you, you weren't covered by the act, we don't have an obligation. But what the employer, the new employer would want is, yeah, let's have an election, let's see it out. And what they would want is they say, wait a minute, we've got a legal right, we'll resolve this dispute in court or with the NLRB. I guess my comment is just in the context of this process, especially given the exclusionary words of the statute, this process is very lengthy. It could have been resolved in about 19 days. Thank you. Thank you very much. Thank you to both counsel for well-presented arguments. We'll take the matter under advisement and call our next case, which is Yellowbird Bus Company v. Lexington Insurance Company.